U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

JUL 2 4 2012

TONY R. MOORE, CLERK
BY ______ DEPUTY

**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **NORMAN PAUL TRAHAN** | * | **6:12-cv-1993 LAF** |
| **VERSUS** | * | |
| **TOWN OF YOUNGSVILLE,** | * | **SECTION:** |
| **YOUNGSVILLE POLICE DEPARTMENT,** | * | |
| **DAVID HULIN, SCOTT BERNARD, EARL** | * | **MAG:** |
| **MERNARD, AND JARRED WAYNE GONZALES** | * | |

*******************************************************************************************

**COMPLAINT**

**NOW INTO COURT** comes Plaintiff, Norman Paul Trahan ("Trahan"), a person of full age of the majority, who is now domiciled and residing in the Parish of Terrebonne, State of Louisiana, and at all times pertinent herein was domiciled and residing in the Parish of Lafayette, State of Louisiana, and was the sole owner and operator of Tiki Gardens, a Youngsville Louisiana limited liability corporation.

**1.**

This action is based on the basic Constitutional Rights given to every United States Citizen, mainly the Fourth, Fifth, and Fourteenth Amendments of the United States Constitution.

**2.**

Made Defendants herein are:

1. Town of Youngsville ("City of Youngsville"), an incorporated municipality in the Parish of Lafayette, State of Louisiana, and, at all times pertinent herein was the employers and governing body over the Youngsville Police Department.

2. Youngsville Police Department ("Youngsville Police"), a government entity in the Parish of Lafayette, State of Louisiana, and, at all times pertinent herein was the employers and supervisors of several named defendants.

3. David Hulin ("Detective Hulin"), an employee of the Youngsville Police Department, employed in the Parish of Lafayette, State of Louisiana, and, at all times pertinent herein held the position of detective.

4. Scott Bernard ("Corporal Bernard"), an employee of the Youngsville Police Department, employed in the Parish of Lafayette, State of Louisiana, and, at all times pertinent herein held the position of uniformed officer.

5. Earl Menard ("Chief Menard"), an employee of the Youngsville Police Department, employed in the Parish of Lafayette, State of Louisiana, and, at all times pertinent herein held the supervisory position of Youngsville Police Chief.

6. Jarred Wayne Gonzales ("Mr. Gonzales"), a person of full age of the majority, domiciled and residing in the Parish of Lafayette, State of Louisiana.

**3.**

At all times pertinent hereto, the named plaintiff and defendants, along with the facts described herein, were located and transpired in the Parish of Lafayette, State of Louisiana.

**4.**

At all times pertinent defendants Youngsville Police Department and Town of Youngsville employed defendants David Hulin, Scott Bernard, and Earl Menard, and said defendants were acting within the course and scope of their employment during the time period described herein.

**5.**

On Friday August 14th 2009 at approximately (12) twelve noon, Trahan returned to his home based office with his (4) four man landscaping crew for their lunch break. Upon exiting the vehicle, Trahan and his crew members immediately heard the shouts of his office manager and garden center saleswoman, Ms. Heidi Broussard, coming from the inside of the establishment. When Trahan reached the front door to the Cajun styled home, which doubled as Trahan's (12) twelve year old son's and his home, as well as Trahan's retail garden center and landscaping headquarters, Trahan heard Ms. Broussard scream out at the top of her lungs, *"Stop, No, Leave Me Alone, Get Away From Me*!" Turning the front office door knob, Trahan then heard a unknown males voice yell out, *"Take Off Your F@&#ing Clothes*," coming from the kitchen area of the home office, some (20) twenty to (30) thirty feet away through a maze of walls and corners. Trahan paused momentarily to make sure he was hearing correctly, and to get a better understanding of what was going on two rooms away. Trahan and two of his employees entered the front of the establishment without being noticed. Ms. Broussard then screamed out, "Leave Me Alone, Get Out Of Here, Get Away From Me." The male's voice then demanded in a loud command, *"Take Off Your Clothes And Give Me The Jewelry You Are Wearing*!" Ms. Broussard again pleaded, *"Get Out Of Here And Leave Me Alone*!"

**6.**

Thinking his employee and business were in the process of being robbed, or even possibly raped, and fearing for the general safety of everyone on the premises, Trahan made his way through the house to the bedroom used by his son, who was not home at the time, and located his sons baseball bat. As Trahan made his way through the house towards the kitchen, another round of the unknown male shouting for Ms. Broussard to take off her clothes and remove her jewelry was underway.

**7.**

Having heard enough, Trahan entered the kitchen area to find Ms. Broussard in the corner with her hands up in a defensive manner, with a beast of a man towering over her. Trahan then recognized the man as Jarred Wayne Gonzales, Ms. Broussard's ex-boyfriend, who, at that time, had open domestic abuse charges against him for physically abusing Ms. Broussard. Ms. Broussard had previously made her wishes known to Trahan and his crew that she did not want anything to do with Mr. Gonzales, who was a self-proclaimed cage fighter with tattoo's covering his body.

**8.**

The Plaintiff raised the baseball bat in a "Babe Ruth" stance and yelled out, "*Get Away From Her Now*!" Startled, Mr. Gonzales lunged toward Trahan in an aggressive manner until he realized one of Trahan's landscaping crew members standing behind Trahan and another coming through the side kitchen door. At that moment, Mr. Gonzales realized he was outnumbered (3) three to (1) one, so he stormed pass the employee entering the kitchen from the side entrance. As Mr. Gonzales headed for his automobile, Trahan yelled out, "*Call The Police*". Mr. Gonzales made his way to his truck and left the premises, unharmed.

**9.**

Trahan never struck Mr. Gonzales with the baseball bat, only warded him off with it. Mr. Gonzales left Trahan's property angry, but in perfect physical health. Trahan's home / business had surveillance cameras that digitally recorded Mr. Gonzales coming to and leaving the premises.

**10.**

Trahan then turned his attention to his employee, Ms. Broussard, who was shaken up, but not harmed physically in any way. Trahan said he was calling the police to make a report but Ms. Broussard asked Trahan not to do so, stating that Mr. Gonzales would not come back and that he already had open charges in St. Landry Parish which she was pursuing. Trahan was reluctant, but agreed not to call the police per his employee's request. Trahan told Ms. Broussard that he would have no choice to file a report if Mr. Gonzales returned to the property for any reason. Ms. Broussard also agreed to call the police if Mr. Gonzales ever returned to the establishment. Feeling like the situation was over, Trahan and his crew members had their lunch and finished out their work day.

**11.**

On Monday August 17th 2009 at approximately (8) eight a.m. (3) three Youngsville Police units as well as a Dodge Sport Utility vehicle arrived at Trahan's business in a show of force and approached the front and side doors of the house. Trahan was met at the door by a plain clothed officer who introduced himself as Detective David Hulin. Detective Hulin asked Trahan if there was somewhere he could ask Trahan some questions. Trahan showed the detective and the (3) three uniformed officers into his personal office. Detective Hulin then asked Trahan if he knew why they were there and Trahan replied, *"It Must Be About The Incident That Happened On Friday."* Detective Hulin went on to say that Mr. Gonzales claimed to have been struck by Trahan with a baseball bat and that the injury required medical attention at University Medical Center in Lafayette Louisiana. Trahan immediately denied the accusations and began to tell Detective Hulin the story the way it had really happened. Trahan told Detective Hulin that all of his employees had witnessed the event and that his surveillance was recording digitally which would prove Mr. Gonzales was never harmed in any way, shape, or form. Detective Hulin then asked Trahan if he would fill out a written statement, which Trahan complied. Detective Hulin then asked to speak to Trahan's employees who witnessed the incident. Detective Hulin went outside into the parking area of the business and spoke to Trahan's employees who all told the same story as Trahan. The employees were asked to fill out statement forms also, which they did. When Detective Hulin returned into the office area he placed Trahan under arrest for the crime of Aggravated Battery, a felony in the State of Louisiana. It was apparent that Detective Hulin went there to arrest Trahan no matter what the evidence suggested. Detective Hulin refused to view the surveillance video that would clear Trahan of any wrong doing. Detective Hulin sent the uniformed officers to search for the bat used in the alleged battery. Trahan was placed in the back of one of the squad cars where he sat handcuffed behind his back for over (1) one hour while Detective Hulin and the uniformed officers congregated outside Trahan's home and business talking, while Trahan's life, reputation, and dreams began to fall apart.

**12.**

Trahan was never read his Miranda warning prior to being questioned or arrested.

13.

On information and belief, Detective Hulin and Mr. Gonzales are long time acquaintances and grew up together in the Bayou Vista or Morgan City Louisiana area. Detective Hulin chose "selective enforcement" and this "friendship" with Mr. Gonzales as the deciding factor in the arrest.

14.

On information and belief, Mr. Gonzales contacted several attorneys in the Lafayette area for representation in a civil suit Mr. Gonzales was attempting to pursue against Trahan and Trahan's business immediately following the alleged battery.

15.

Trahan's home and business was located directly across from Nu Nu's, Youngsville Louisiana's busiest grocery store, on Youngsville's busiest street, Louisiana Highway 89, also known as Youngsville Highway, or physically known by the United States Postal Service as Lafayette Street. Trahan was arrested that Friday with such a show of force, during the morning commute, that many of Youngsville's citizens witnessed the police activity at the up and coming garden center, which was fast becoming a "household name" in the area, either from the highway passing by, or from the grocery store parking lot across the street, where many go for breakfast biscuits before heading off to work. The police presence at the small business was anything but short and sweet, taking several hours to interview and gather statements from Trahan and his witnesses. Trahan sat in the backseat of a squad car parallel to the highway for over an hour, handcuffed behind his back, watching the slow moving traffic pass by with their heads turned, staring at the activity going on at the business. Many of the residents assumed a tragedy of some sort had taken place at the business. And with those assumptions, came the rumors and gossip that go hand and hand with a small town. Rumors from murder to child abuse would fill the neighborhoods and grocery store aisles. Trahan posted a (5) five thousand dollar bond after spending all day in the Lafayette Parish Criminal Complex. Trahan would feel the effects of the bogus, trumped up arrest and the rumors it started the very next day.

16.

Trahan began experiencing the effects of the faulty arrest right away, from stares at the grocery store across the street from his home / office, to telephone calls from other business owners in the Youngsville area asking what had happened. Local homeowner's association members came to Trahan with the version of the rumors they had heard, expressing concerns because Trahan had contracts with their neighborhoods. Embarrassment and shame took the place of the pride and ambition Trahan once had. Retail sales began to fall drastically and landscape installations were cancelled. It is clear that the false arrest hurt Trahan's reputation, which in turn, hurt his once thriving small business.

17.

Over the next year and a half Trahan endured several instances of police harassment from numerous uniformed officers in the Youngsville Police Department. On May 22, 2010 at approximately (10) ten p.m. Corporal Scott Bernard watched Trahan leave his home/ business from the parking lot of the grocery store across the street. Corporal Bernard pulled in behind Trahan and followed him through the next intersection. As Trahan approached the next intersection he put his turning signal to initiate his left turn. Corporal Bernard immediately turned on his warning lights and sirens as Trahan made his left turn. Trahan pulled over and exited his vehicle and was told by Corporal Bernard that he was being pulled over for not using his turning signal (150) one hundred fifty feet before his turn, which would have been at the previous intersection, which was not the turn that Trahan was taking. It became clear that this was a "not so routine" traffic stop. Corporal Bernard knew Trahan had an unpaid traffic ticket in Iberia Parish prior to the stop. The left turn signal was the excuse Corporal Bernard gave Trahan when he entrapped him. On two known occasions, Youngsville Police cruisers pulled into Trahan's parking lot in the early morning hours and turned on their lights and sirens, scaring Trahan out of his sleep. The squad cars would keep the sirens wailing for what felt like hours, until Trahan would get out of bed and go see what was going on. They would pull off once Trahan's lights would come on in the house. On another occasion, Trahan and his crew were returning from a day in the hot Louisiana sun, they approached the intersection at Hwy. 89 and Iberia Street, which is close to Trahan's home and business when Trahan and his crew was met by two Youngsville Police units at the stop sign. Once Trahan passed through the intersection, the squad cars put on their lights and sirens and did U-turns in the middle of the intersection during (5) five o'clock traffic. When Trahan reached his business the police officers were right behind him and followed Trahan into the parking lot. The officers exited their cruisers and claimed they had received a call that Trahan's home / office had a possible break in. The officers said that when they reached the establishment they found the side door open, so they searched the inside looking for any signs of a burglary or theft. The officers said they found no signs of foul play, so they locked the door behind themselves and left the scene, that's when they saw Trahan at the stop sign. Trahan then entered his home / office and conducted his own search of the premises. Upon reviewing the digitally recorded surveillance video, Trahan witnessed the (2) two squad cars come from the grocery store

parking lot across the street, park their cars, talk to each other for a second, then they entered the house from the side kitchen door. No other vehicles or people were recorded on the property since Trahan and his crew ate lunch on the premises earlier that day. On another occasion, Trahan received temporary custody of his then (14) fourteen year old daughter, who had alleged that her step father had abused her. Trahan's daughter did not want to live with him either, and told Trahan she would tell her teachers at Youngsville Middle School that Trahan too had abused her in an attempt to move back with her mother. Trahan called the school early the next morning to let the principle know that his daughter may make accusations against him in order to return to her mother, Trahan's ex-wife, in Houma, Louisiana. Trahan's daughter did make allegations of abuse to the principle at her school and a hour or so later, Detective Hulin and (2) two squad cars arrived at Trahan's home / business, along with a man from the State of Louisiana's child welfare office, to question Trahan about the allegations his daughter had made. Trahan provided the welfare officer with documents showing that his daughter was having problems and she had made the same allegations against her step father, only weeks before. Trahan was cleared of any wrong doing, but the police presence at his business, and the rumors that followed, once again hurt his already failing business. Trahan called for Chief Menard twice, who was "out of the office" every time Trahan would give the secretary his name, to file complaints against Detective Hulin and the deputies that were harassing him. Chief Menard never returned any of Trahan's phone calls.

**18.**

On August 19th 2011, almost (2) two years to the day after the false arrest and miscarriage of justice for a crime Trahan did not commit, and (8) eight months after officially shutting his business down and closing its doors, Justice did prevail. Trahan received a Certified Letter from the Lafayette Parish District Attorney stating they had refused the Aggravated Battery charge against Trahan *"due to lack of evidence."*

**19.**

As a direct and proximate cause of the Defendants negligence and intentional misconduct, Trahan has suffered the following injuries and damages:

Violations of his Constitutional Rights;

Aggravation of a prior emotional and physical condition;

Mental and physical pain and suffering;

Loss of future earnings and earning capacity;

Discomfort and inconvenience,

And loss of enjoyment of life.

**20.**

Trahan demands a trial by jury in accordance with the Federal Rules of Civil Procedure.

**WHEREFORE, PREMISES CONSIDERED,** the Plaintiff, NORMAN PAUL TRAHAN, demands a judgment against the Defendants, Town of Youngsville, Youngsville Police Department, David Hulin, Scott Bernard, Earl Menard, and Jarred Wayne Gonzales, jointly, severally, and *in solido,* in the full sum of $3,000,000.00, three million dollars, together with expenses incurred, such as, but not limited to, legal interest, trial cost, and any and all general and equitable relief that may be appropriate, as a result of the false arrest and Constitutional Rights violations the Plaintiff endured as a result of the Defendants actions.

Respectfully submitted,

Norman Paul Trahan

817 High Street

Houma, Louisiana 70360

(985) 209-7163

Acting and serving as his own attorney, Pro Se.

**CERTIFICATE OF SERVICE**

I do hereby certify that the foregoing was mailed to the United States District Court for the Western District of Louisiana Clerk of Court via U.S. Certified Mail this 23rd day of July, 2012.

Norman Paul Trahan

817 High Street

Houma, Louisiana 70360

(985) 209-7163

normantrahan@yahoo.com

**Norman Paul Trahan**

**817 High Street**

**Houma, Louisiana 70360**

**(985) 209-7163**

normantrahan@yahoo.com

U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

JUL 24 2012

TONY R. MOORE, CLERK
BY ______ DEPUTY

07/23/2012

Dear Clerk of Court,

Please find enclosed (7) seven signed copies of a Complaint that needs to be filed into the record and served upon the defendants as soon as possible. Also, please find a money order in the amount of $350.00 to cover filing fees. Also find a Request for Notice that is to be filed into the record along with the Complaint.

Please do not hesitate to contact me at the contact information given above with any questions or concerns.

Thank you very much,

**Norman Paul Trahan**

Plaintiff, Pro Se


Norman Trahan
817 High St.
Houma, LA 70360
X-RAYED
CLEARED FOR DELIVERY
PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT OF THE RETURN ADDRESS, FOLD AT DOTTED LINE
CERTIFIED MAIL
7011 1570 0003 4664 6524
UNITED STATES POSTAL SERVICE
1000
70502
U.S. POSTAGE
PAID
GOLDEN MEADOW,LA
70357
JUL 23, 12
AMOUNT
$8.60
00088527-03
RETURN RECEIPT REQUESTED
Clerk of Court
Western District of Louisiana
800 Lafayette Street
Lafayette, Louisiana 70502
U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED
JUL 24 2012
TONY R. MOORE, CLERK
BY DEPUTY